**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PATRICIA PATRICK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 07-766** |
| | ) | |
| **VERIZON SERVICES** | ) | |
| **CORPORATION, a wholly owned** | ) | |
| **subsidiary of VERIZON** | ) | |
| **COMMUNICATIONS, INC.,** | ) | |
| **VERIZON COMMUNICATIONS, INC.,** | ) | |
| **LONG-TERM DISABILITY PLAN FOR** | ) | |
| **MID-ATLANTIC ASSOCIATES, PN** | ) | |
| **516 and its ADMINISTRATOR,** | ) | |
| **VERIZON CLAIMS REVIEW** | ) | |
| **COMMITTEE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

Before the Court for disposition are the Stipulation Concerning Contents of Administrative Record and Evidentiary Appendix Filed in Connection with Cross-Motions for Summary Judgment (*Document No. 36*), the Appendix to the Stipulation (*Document No. 37*), the Defendants' MOTION FOR SUMMARY JUDGMENT (*Document No. 38*), the Defendants' Memorandum in Support of Motion for Summary Judgment (*Document No. 39*), the Defendants' Concise Statement of Material Facts in Support of Motion for Summary Judgment (*Document No. 40*), the Plaintiff's MOTION FOR SUMMARY JUDGMENT (*Document No. 41*), the Plaintiff's Brief in Support of Motion for Summary Judgment (*Document No. 42*), the Plaintiff's Concise Statement of Material Facts (*Document No. 43*), the Plaintiff's Supplement to Brief in Support of Motion for Summary Judgment (*Document No. 44*), the Plaintiff's Errata Sheet to Brief in Support of Motion for Summary Judgment and Concise Statement of Material Facts (*Document No. 47*), the Plaintiff's Response to Motion for Summary Judgment (*Document No. 50*), the Plaintiff's Response to Concise Statement of Material Facts and Counterstatement

1

(*Document No. 51*), the Plaintiff's Brief in Response to Motion for Summary Judgment (*Document No. 52*), the Defendants' Memorandum in Opposition to Motion for Summary Judgment (*Document No. 53*), and the Defendants' Response to Concise Statement of Material Facts (*Document No. 54*). For the reasons that follow, the Defendants' Motion for Summary Judgment (*Document No. 38*) will be granted in part and denied in part, and the Plaintiff's Motion for Summary Judgment (*Document No. 41*) will be granted in part and denied in part.

## Background

Plaintiff Patricia Patrick ("Patrick") was born on February 6, 1953, making her 56 years of age at the present time. Doc. No. 54 at ¶ 2. On October 31, 1983, at the age of 30, Patrick was hired by AT&T and Bell Atlantic Corporation ("Bell Atlantic"). *Id.* at ¶ 1. Bell Atlantic later merged with GTE[1] to form Verizon Services Corporation ("Verizon"), a wholly owned subsidiary of Verizon Communications, Inc. ("Verizon Communications"). *Id.* at ¶ 3. Verizon Communications sponsored a health and welfare plan which provided for long-term disability ("LTD") benefits. *Id.* at ¶ 4. It was known as the Verizon Long-Term Disability Plan for Mid-Atlantic Associates, PN 516 (the "Plan"). *Id.* Verizon was a participating member of the Plan. *Id.* at ¶ 6.

At all times relevant to this case, Patrick was a participant or beneficiary under the Plan. *Id.* at ¶ 7. The Plan was funded by the general assets of the participating companies. *Id.* at ¶ 8. Under the Plan's definitions, Verizon Plan 553 includes both LTD benefits and the Verizon Sickness and Accident Disability Benefit Plan for Mid-Atlantic Associates (the "SADBP"). *Id.* at ¶ 10. The Summary Plan Description ("SPD") includes the following language concerning LTD benefits:

> LTD benefits may begin after you have received 52 weeks of Sickness Disability Benefits. To receive benefits you must meet one of the following conditions:
>
> •    You must be unable to work in any occupation or employment for which you are or may become reasonably qualified by training, education, or experience.
>
> •    As a result of your disability, you are only able to work at a job that pays

---

It is not clear what "GTE" stands for.

2

less than half of your basic pay rate at the time you became disabled.

- In addition, you must be under the care of a qualified physician who must provide appropriate documentation of your disability. You must take proper care of yourself and receive proper medical treatment. Otherwise, you will not be eligible for benefits.

*Id.* at ¶ 11. The Plan defines the term "disability" as "[t]he inability, due to sickness or injury documented by objective medical evidence, of the Participant to (i) perform any occupation or employment for which the Participant is (or may reasonably become) qualified by reason of education, training or experience, or (ii) to perform any job that pays (on a full-time basis) 50% or more of the Participant's Base Pay at the time the Participant is disabled." Doc. No. 37-3, pg. 2; Appendix Tab B, V-0006. Neither the Plan nor the SPD defines the term "objective medical evidence." Doc. No. 54 at ¶ 13. The Plan permits a participant to receive LTD benefits until he or she either dies or ceases to be disabled. *Id.* at ¶ 14.

The Verizon Employee Benefits Committee ("VEBC") and the Verizon Claims Review Committee ("VCRC"), and the chairs of each, have discretion to designate claims and appeals administrators for each benefit. *Id.* at ¶ 18. Verizon's sickness and accident benefits, or short-term disability ("STD") benefits, are administered by a company known as CORE, Inc. ("CORE"). *Id.* at ¶ 15. Verizon's LTD benefits are administered by the Metropolitan Life Insurance Company ("MetLife"). *Id.* at ¶ 17. The VCRC has the authority to designate itself as the final appeals administrator under the Plan, either in place of the existing appeals process or as an additional level of appeal beyond that process. *Id.* at ¶ 19. In Patrick's case, the VCRC entertained an appeal beyond the existing process. *Id.* at ¶ 20. The VCRC had the final and sole authority to review and resolve her final appeal. *Id.* at ¶ 21. Before the VCRC was designated as the final appeals administrator for Patrick's claim, this authority had been with MetLife.[2] *Id.* at ¶ 22. The VCRC is comprised of individuals employed by Verizon Communications and its affiliates. *Id.* at ¶ 24.

---

[2]On March 1, 2003, Verizon evidently contracted with MetLife to have it administer both the STD and LTD benefits available to its employees with respect to claims accruing on or after January 1, 2004. Doc. No. 54 at ¶ 23. This agreement did not affect Patrick, since her claim arose before that date.

Patrick was involved in an automobile accident in October 1993.  *Id.* at ¶ 26.  In February 1994, she fell on a patch of ice while walking to work.  *Id.* at ¶ 27.  These accidents apparently caused the condition of her back to deteriorate.  *Id.*  She underwent rotator cuff surgery on August 9, 1999.  During the course of Patrick's employment at Verizon, CORE accumulated medical records which documented her injuries.  *Id.* at ¶ 29.  Patrick apparently suffered from chronic back problems.  *Id.*

Patrick's primary care physician is Dr. Dawna Woodyear ("Dr. Woodyear").  *Id.* at ¶ 31. Patrick sought treatment from Dr. Woodyear for pain in her lower back, osteoarthritis, and back motion difficulty.  *Id.*  On April 2, 2001, Dr. Woodyear determined that Patrick was capable of working for only half-days.  *Id.*  At that time, Patrick was working as a service representative for Verizon.  *Id.* at ¶ 33.  She was examined by Dr. William Donaldson ("Dr. Donaldson"), an orthopedic surgeon, on July 3, 2001.  *Id.* at ¶ 34.  On July 7, 2001, she underwent a magnetic resonance imaging ("MRI") scan.  *Id.* at ¶ 35.  This MRI scan yielded the following findings:

> The L1-2 and L2-3 levels are within normal limits.
>
> At L3-4 level, there is desiccated disc.  There is minimal facet arthrosis and ligamentum flavum hypertrophy resulting in mild canal stenosis.
>
> At the L4-5 level, there is diffuse disc bulge slightly more prominent on the right than on the left with mild desiccation of the L4-5 disc.  There is bilateral facet arthrosis and ligamentum flavus hypertrophy resulting in moderate canal stenosis. The neural foramina do not appear to be narrowed.
>
> The L5-S1 level is normal.

Doc. No. 37-24, pg. 12; Appendix Tab F, PP00023.  Because of these findings, surgery was required.

On August 28, 2001, Patrick worked her last day for Verizon.  Doc. No. 54 at ¶ 32.  Three days later, on August 31, 2001, she underwent surgery on her lumbar spine.  *Id.* at ¶ 36.  Dr. Donaldson performed the surgery.  Metal rods were inserted into her spine.  *Id.*  Unable to work, Patrick began to receive STD benefits.  *Id.* at ¶ 37.  The SADBP provides that an employee receiving STD benefits may sometimes be required to undergo an independent medical examination ("IME") for the purpose of assessing his or her medical condition and continued

eligibility for benefits. Doc. No. 37-5, pg. 17; Appendix Tab D, V-0079. At CORE's request, Patrick underwent an IME on April 11, 2002. Doc. No. 54 at ¶ 38. The examining physician was Dr. David Frame ("Dr. Frame"), an orthopedic surgeon. *Id.* In a written report dated April 16, 2002, Dr. Frame stated that Patrick's prospective return-to-work date was "undetermined." Doc. No. 37-9, pgs. 7-8; Appendix Tab E, V-0182-V-0183. After Dr. Frame's examination, no physician examined Patrick on behalf of Verizon, Verizon Communications or MetLife. Doc. No. 54 at ¶ 46.

Around April or May of 2002, Patrick received a packet of materials needed to apply for LTD benefits under the Plan. *Id.* at ¶ 47. Patrick formally applied for LTD benefits on May 7, 2002. *Id.* at ¶ 50. That same day, Dr. Donaldson examined Patrick. In a treatment note, he recorded the following observations:

> She still has back and leg pain with limited sitting and standing tolerance. I have recommended that she return in July, and I put her on Ultram and Neurontin, 300 mg. po bid. We will increase to 600 po bid if she does not get relief. In July, she will need to consider going back to work in August, or she most likely will lose her job, and I do not think that she is a candidate for Social Security disability.

Doc. No. 37-14, pg. 21; Appendix Tab E, V-0331. On July 9, 2002, Dr. Donaldson examined Patrick again. Doc. No. 54 at ¶ 53. He completed a functional capacity assessment form indicating that Patrick was totally disabled. *Id.* at ¶ 55. He also completed a form requesting that Patrick's STD benefits be extended because of her inability to sit or stand for prolonged periods of time. Doc. No. 37-9, pg. 10; Appendix Tab E, V-0185. Patrick was instructed to return to Dr. Donaldson's office for a follow-up appointment in January 2003. *Id.* In the meantime, Dr. Donaldson listed Patrick's return-to-work date as "undetermined." *Id.*

MetLife requested additional information from Patrick on August 9, 2002. Doc. No. 54 at ¶ 59. Patrick was informed that she needed to apply for Social Security disability benefits, and that LTD benefits under the Plan, even if approved, could not be paid to her beyond a period of six months in the absence of an application for Social Security disability benefits. Doc. No. 37-13, pg. 4; Appendix Tab E, V-0289. On August 19, 2002, Patrick completed and faxed to MetLife a form describing her functional limitations. Doc. No. 54 at ¶ 61. She indicated that she would need a recliner if she were to return to work, and that her inability to sit would likely

preclude her from performing her duties as a service representative. *Id.* at ¶ 62. CORE noted in its records that Patrick had been approved for STD benefits through September 3, 2003, and that she did not have a designated return-to-work date. *Id.* at ¶ 64.

Dr. Donaldson submitted a statement to MetLife on August 29, 2002, which indicated that Patrick could "intermittently" sit, stand or walk for up to one hour during the course of an eight-hour workday. Doc. No. 37-13, pg. 9; Appendix Tab E, V-0294. He reported that Patrick could work for up to four hours per day "to start the process." *Id.* He also noted that he expected Patrick's condition to improve. *Id.* Nevertheless, in a portion of the statement asking whether he had advised Patrick to return to work, Dr. Donaldson put a slash mark through the box next to the word "No." *Id.* As an explanation for his decision not to clear Patrick to return to work, Dr. Donaldson wrote the words "patient to be re-evaluated next visit." *Id.*

During the first week of September 2002, Patrick's 52 weeks of STD benefits were exhausted. Doc. No. 54 at ¶ 73. In a letter to Patrick dated September 17, 2002, Wendy M. Howell ("Howell"), an absence administrator for Verizon, stated that Patrick's employment with Verizon had been terminated on September 4, 2002, pursuant to a policy requiring the termination of an employee who fails to return to work after the exhaustion of STD benefits. Doc. No. 37-25, pg. 19; Appendix Tab F, PP000115. MetLife apparently sought additional information from Dr. Donaldson on September 27, 2002. Doc. No. 54 at ¶ 75. On October 4, 2002, a MetLife case manager attempted to fax a message to Dr. Donaldson's office inquiring as to whether the earlier request for information had been received. *Id.* at ¶ 75. The record includes a copy of the inquiry marked with a notation reading "send failed." Doc. No. 37-14, pg. 8; Appendix Tab E, V-0318. It is unclear whether Dr. Donaldson ever received MetLife's request for additional information. That same day, Patrick filed an application for disability insurance benefits under Title II of the Social Security Act [42 U.S.C. §§ 401-433], alleging that she had been disabled since August 28, 2001. Doc. No. 37-52, pg. 17; Appendix Tab K, V-0993.

On October 8, 2002, Verizon forwarded to MetLife a job description for the position of service representative. Doc. No. 54 at ¶ 77. The job description stated that a service representative was required to sit at a stationary work location, and to use a visual display terminal, "for extensive periods of time." Doc. No. 37-14, pg. 10; Appendix E, V-0320. In a

letter to Patrick dated October 16, 2002, Paulina Patricia ("Patricia"), a case manager for MetLife, informed Patrick that her claim for LTD benefits had been denied. Doc. No. 54 at ¶ 80. After describing the standards used to determine whether a particular individual was "disabled" under the Plan, Patricia's letter went on to state as follows:

> In addition, you must be under the care of a qualified physician who must provide appropriate documentation of your disability. You also must take proper care of yourself and receive proper medical treatment. Otherwise, you will not be eligible for benefits.
>
> Please refer to our letter dated August 9, 2002 requesting that you provide all medical records for review. To date the following information has not been received:
>
> • All office visit notes and test reports from your date of disability through the present including the most recent progress notes and treatment plan.
>
> We have reviewed your entire claim, including the following information that was submitted:
>
> • Attending Physician Statement and Physical Capacity Evaluation form from Dr. Donaldson. He diagnosed you with neuritis/radiculitis.
> • Personal Profile Evaluation.
>
> Because no current clinical information has been received to support your disability claim, we must respectfully deny your claim based on a lack of medical evidence.

Doc. No. 37-25, pg. 8; Appendix Tab F, PP00080. Nobody from MetLife had informed Patrick prior to the denial of her claim that she would be afforded at least 45 days to supply the sought-after information. Doc. No. 54 at ¶ 87.

MetLife's file contains a fax sheet from Patricia to Dr. Donaldson dated September 30, 2002, seeking information concerning Patrick's claim for LTD benefits on or before October 14, 2002. Doc. No. 37-14, pg. 16; Appendix Tab E, V-0326. According to MetLife's records, Patrick was told that she could appeal the denial, and that the missing information could be submitted for appellate consideration. Doc. No. 37-28, pg. 7; Appendix Tab G, MM-00000042. Hewitt & Associates ("Hewitt") maintains an office in Lincolnshire, Illinois. Doc. No. 54 at ¶

92. On October 21, 2002, Patricia sent a letter to Shawn Pettus ("Pettus"), a Hewitt employee, stating that "the medical information provided" had not established that Patrick was "disabled" under the Plan. *Id.* at ¶ 91.

Patrick appealed the denial of her claim for LTD benefits on November 11, 2002. *Id.* at ¶ 94. She included Dr. Donaldson's office notes in her record for appeal. *Id.* Acknowledging that Dr. Donaldson had not responded to MetLife's previous requests for information, Patrick explained in a letter that she should be contacted directly if additional information was necessary in order to resolve her appeal. Doc. No. 37-14, pg. 17; Appendix Tab E, V-0327. In a letter dated November 12, 2002, Patrick stated that sitting for more than fifteen minutes at a time would cause her to endure "severe stabbing pain." Doc. No. 37-14, pg. 18; Appendix Tab E, V-0328.

Dr. Donaldson examined Patrick on December 17, 2002. Doc. No. 54 at ¶ 96. In the "subjective" section of his follow-up report, Dr. Donaldson stated as follows:

> She is a year and a half post decompression and fusion. She said she does not have insurance now and is still having back pain. She has been to two pain treatment centers, one in Shadyside and one in Monroeville. She has tried shots. She says she had put on weight. She has quite [sic] smoking and gets low back pain. When I saw her last time, her x-rays showed the fusion to be fairly solid. She continues to have discomfort and is upset today because her disability claim was denies [sic]. I, however, explained to her that with her job at Verizon it is a light duty job and that in my note back in May I did not think she was a good candidate for Social Security Disability since she was still fairly active. She wrote a letter to the Metropolitan Life Insurance saying that she could not sit longer than 15 minutes. She is getting pain in her back. She is taking over-the-counter medications because she cannot afford the medications prescribed.

Doc. No. 37-25, pg. 11; Appendix Tab F, PP00083. The examination revealed that Patrick had "pain with forward bending, extension and lateral bending." *Id.* Although Dr. Donaldson wanted to order an MRI scan for Patrick, he was unable to do so because of her lack of insurance coverage.[3] *Id.*

---

[3] Dr. Donaldson's treatment note concerning his December 17, 2002, examination of Patrick was apparently never presented to MetLife or the VCRC prior to the final denial of Patrick's claim for LTD benefits. Doc. No. 39, pg. 24, n. 7.

Patrick underwent an MRI scan on March 26, 2003. Dr. Cheryl Bernstein ("Dr. Bernstein") observed that the MRI scan had shown a "normal anatomic alignment" and "no areas of significant stenosis or foraminal compromise." Doc. No. 37-21, pg. 17; Appendix Tab E, V-0735. Nevertheless, Patrick's uterus appeared to be large, suggesting that she may have had large uterine fibroids. *Id.* Dr. Bernstein and Dr. Brian Cicuto ("Dr. Cicuto") treated Patrick at the Pain Evaluation and Treatment Institute, which is affiliated with the University of Pittsburgh Medical Center's ("UPMC") Division of Pain Medicine. Doc. No. 54 at ¶ 125.

Under a regulation promulgated by the Secretary of Labor, MetLife was required to either render a decision on Patrick's appeal within 45 days or provide written notice to her that more time was needed to decide the matter. 29 C.F.R. § 2560.503-1(i)(3)(i). MetLife failed to act on Patrick's appeal within the specified period of time. Doc. No. 54 at ¶ 100. In a letter to Patrick from case manager Melissa DeMay ("DeMay") dated June 3, 2003, MetLife denied Patrick's claim for LTD benefits. *Id.* at ¶ 99. DeMay's letter included the following comments:

> The information received and reviewed by MetLife fails to establish that you have experienced a level of continued impairment that prevents you from performing the duties of any occupation or employment due to a physical condition.
>
> Dr. Donaldson noted in the Attending Physician Statement dated 08/29/2002 under physical capabilities that you could work a total of 4 hours a day to start the progress. He also notes that he expected improvement.
>
> Please understand that we do not dispute your diagnoses or that you may have discomfort and pain with your condition. However, many individuals experience a variety of discomforts, but these do not render an individual unable to be gainfully employed. A diagnosis of a medical condition alone does not support a disability or an inability to work.
>
> Based on our review, we have not been provided with substantial medical information to support a severe physical/mental condition that would preclude you from performing your occupation. Therefore, you do not meet the definition of disability for own occupation/own employer for which you are qualified.

Doc. No. 37-15, pg. 24; Appendix Tab E, V-0359. Prior to rendering its decision, MetLife did not request or review the records that Verizon had concerning Patrick's medical history. Doc. No. 54 at ¶ 107. MetLife had received records from CORE on April 7, 2003, but they were not

reviewed prior to the June 3, 2003, denial of Patrick's appeal. *Id.* MetLife did not locate the records containing Dr. Frame's examination report until May 2004, so the report was not considered in deciding the appeal. *Id.* at ¶ 109. The record indicates that Patrick's attorney, Joseph P. Decker ("Decker"), was told on January 9, 2004, that the information from CORE had constituted a "stand alone account." Doc. No. 37-28, pg. 14; Appendix Tab G, MM-00000049. No physician reviewed Patrick's medical records prior to MetLife's denial of her appeal on June 3, 2003. Doc. No. 54 at ¶ 110.

Dr. Robert G. Liss ("Dr. Liss") examined Patrick on July 18, 2003. In a letter to Patrick's treating neurologist, Dr. Antoin Munirji ("Dr. Munirji"), Dr. Liss stated that he did not recommend that Patrick undergo surgery designed to remove the metal rods which had been placed in her back by Dr. Donaldson. Doc. No. 37-18, pgs. 7-8; Appendix Tab E, V-0650. He opined that Patrick's back pain may have been caused by something other than the impairment which had led Dr. Donaldson to perform back surgery. *Id.* According to Dr. Liss, the true source of Patrick's back pain needed to be identified before another operation was performed. *Id.*

Patrick appealed MetLife's June 3, 2003, denial through a faxed letter from Decker to DeMay dated November 25, 2003. Doc. No. 54 at ¶ 111. The letter indicated that Patrick intended to submit additional documentary evidence in support of her claim. *Id.* at ¶ 112. Decker mentioned in the letter that he needed MetLife to provide him with copies of the documents which had been relied upon by MetLife in denying Patrick's appeal. *Id.* at ¶ 113. Under the applicable regulation, Patrick had 180 days to appeal MetLife's denial of her initial appeal. 29 C.F.R. § 2560.503-1(h)(3)(i), (4). MetLife's records indicate that, on November 25, 2003, Decker was told that the filing of the appeal would toll the 180-day clock, thereby giving him more time to supply additional information in support of Patrick's claim. Doc. No. 37-28, pg. 10; Appendix Tab G, MM-00000045.

On December 1, 2003, MetLife informed Decker that it had received his letter appealing the earlier denial of Patrick's claim, that the claim had been referred for an independent claim review, and that a determination would made within 45 days. Doc. No. 54 at ¶ 114. A notation in MetLife's records dated December 1, 2003, indicated that the previous information that had been given to Decker concerning the tolling of the 180-day appeal clock had been incorrect, and

that the clock would continue to run (with respect to Patrick's ability to present additional information) despite MetLife's receipt of Decker's letter.  Doc. No. 37-28, pg. 11; Appendix Tab G, MM-00000046.  Meanwhile, MetLife was permitted to extend the 45-day period that it had to decide the appeal in order to give Patrick an opportunity to produce additional evidence in support of her claim.  Doc. No. 54 at ¶ 116.  The applicable regulation provides that when a claimant is notified of such an extension due to his or her failure to submit information necessary for a decision, "the period for making the benefit determination on review shall be tolled from the date on which the notification of the extension is sent to the claimant until the date on which the claimant responds to the request for additional information."  29 C.F.R. § 2560.503-1(i)(4).

On December 3, 2003, MetLife sent to Decker the information that he had requested in his letter by means of overnight mail.  Doc. No. 54 at ¶ 119.  Decker was told on December 8, 2003, that the 180-day appeal period had already run, and that MetLife could not give him more time to submit additional information.  Doc. No. 37-28, pg. 12; Appendix Tab G, MM-00000047.  Nevertheless, MetLife informed Decker that it would accept additional information up until December 21, 2003, which was the twenty-third day of the 45-day period, provided that no decision had been rendered by that date.  *Id.*

In a letter to Decker dated December 18, 2003, MetLife stated that it needed an additional 22 days to reach a decision concerning Patrick's appeal.  Doc. No. 37-16, pg. 23; Appendix Tab E, V-0614.  The purported reason for the extension was MetLife's need to conduct a "medical records review" and a "health care professional review."  *Id.*  The next day, Decker faxed a letter to Minochka Taylor ("Taylor"), a MetLife procedure analyst, indicating that additional documentation was being submitted in connection with Patrick's appeal.  Doc. Nos. 37-16, pg. 22, 37-17, pg. 12; Appendix Tab E, V-0597, V-0629-V-0630.  Included within the faxed materials were records provided by Dr. Woodyear, Dr. Munirji, Dr. Bernstein and Dr. Cicuto.  Doc. No. 54 at ¶ 125.  Decker's letter stated that he had spoken with Lisa Touloumjian ("Touloumjian"), who had assured him that he could submit an additional report from a treating physician provided that he did so within 90 days of MetLife's notice that it had received the

appeal letter.[4]  Doc. No. 37-17, pg. 13; Appendix Tab E, V-0630.  The materials faxed to Taylor included statements from some of Patrick's treating physicians stating that she was "unable to work on a regular basis."  Doc. No. 37-18, pgs. 2 & 5; Appendix Tab E, V-0644, V-0647.  In his letter to Taylor, Decker expressed concern that some of the records which had previously been submitted to MetLife had not been properly considered during the "initial review process."  Doc. No. 37-17, pg. 13; Appendix Tab E, V-0630.

   After being reviewed by an appeal specialist, Patrick's claim was referred for a clinical review.  Doc. No. 54 at ¶ 129.  On January 6, 2004, Taylor referred Patrick's claim to Dr. Amy Hopkins ("Dr. Hopkins"), a consulting physician.  *Id.* at ¶¶ 130-131.  The referral asked Dr. Hopkins to render an opinion as to whether the documentation on file with MetLife demonstrated the existence of functional limitations or deficits sufficiently severe to preclude Patrick from performing the duties of her job as of September 6, 2002.  Doc. No. 37-13, pg. 2; Appendix Tab E, V-0286.  The applicable job description was attached to Taylor's inquiry.  *Id.*  Decker contacted MetLife on January 9, 2004, to inquire about the status of Patrick's appeal.  Doc. No.

---

[4]The 90-day limitations period referenced in Decker's letter was based on the interaction of two separate regulations.  The first regulation, which is codified at 29 C.F.R. § 2560.503-1(i)(1), provides:

> (i) *Timing of notification of benefit determination on review.*  (1) *In general.*  (i) Except as provided in paragraphs (i)(1)(ii), (i)(2), and (i)(3) of this section, the plan administrator shall notify a claimant in accordance with paragraph (j) of this section of the plan's benefit determination on review within a reasonable period of time, but not later than 60 days after receipt of the claimant's request for review by the plan, unless the plan administrator determines that special circumstances (such as the need to hold a hearing, if the plan's procedures provide for a hearing) require an extension of time for processing the claim.  If the plan administrator determines that an extension of time for processing is required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial 60-day period.  In no event shall such extension exceed a period of 60 days from the end of the initial period.  The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the plan expects to render the determination on review.

29 C.F.R. § 2560.503-1(i)(1).  The language of this regulation makes clear that no extension of time can more than double the amount of time between the administrator's receipt of an appeal and the ultimate disposition of that appeal.  The second regulation relevant to this issue is 29 C.F.R. § 2560.503-1(i)(3)(i), which provides:

> (3) *Disability claims.*  (i) Except as provided in paragraph (i)(3)(ii) of this section, claims involving disability benefits (whether the plan provides for one or two appeals) shall be governed by paragraph (i)(1) of this section, except that a period of 45 days shall apply instead of 60 days for purposes of that paragraph.

29 C.F.R. § 2560.503-1(i)(3)(i).  This regulation shortened the applicable limitations period in Patrick's case from 60 days to 45 days.  Because no extension could be granted for more than double the enumerated limitations period, MetLife was obliged to decide Patrick's appeal within 90 days of its receipt of Decker's appeal letter.

54 at ¶ 133.  After learning that the claim had been referred for a clinical review, Decker asked that MetLife's decision be delayed so that he could submit documents that were in CORE's files. *Id.*  These documents related to Patrick's previous receipt of STD benefits.  *Id.*  Decker was told that since the 180-day limitations period for filing an appeal had run, it was too late for him to submit additional documents.  Doc. No. 37-28, pgs. 14-15; Appendix Tab G, MM-00000049-MM-00000050.

Dr. Hopkins proceeded to review Patrick's medical records.  On January 12, 2004, Dr. Hopkins opined in a signed report that "[n]o physical impairment was objectively documented" which would have precluded Patrick from returning to work as a service representative for Verizon on September 6, 2002, "as long as she was free to change position as needed for comfort."  Doc. No. 37-17, pg. 8; Appendix Tab E, V-0624.  That same day, MetLife upheld the prior denial of Patrick's claim.  Doc. No. 54 at ¶ 134.  Taylor informed Decker of MetLife's decision in a letter dated January 12, 2004.  Doc. No. 37-6, pgs. 20-24; Appendix Tab E, V-0120-V-0124.  Neither Patrick nor her treating physicians were given an opportunity to review Dr. Hopkins' report before the issuance of the denial letter.  Doc. No. 54 at ¶ 192.

Dr. Cicuto did not complete a written statement concerning Patrick's work-related capacities until January 13, 2004.  *Id.* at ¶ 195.  In his statement, Dr. Cicuto opined that Patrick had a limited ability to sit, stand or work.  *Id.* at ¶ 196.  He indicated that Patrick was unable to perform the duties of her job, and that he had not advised her to return to work.  *Id.* at ¶ 197.

On February 26, 2004, Administrative Law Judge Melvin Rosenberg (the "ALJ") issued a written decision granting Patrick's claim for disability insurance benefits under Title II of the Social Security Act.  Doc. No. 37-52, pgs. 13-21; Appendix Tab K, V-0989-V-0997.  Based on the evidence before him, the ALJ concluded that Patrick was unable work for an entire eight-hour day.  Doc. No. 37-52, pg. 19; Appendix Tab K, V-0995.  Relying on the testimony of Fred Monaco ("Monaco"), an impartial vocational expert, the ALJ determined that Patrick's inability to work for an entire day had rendered her incapable of performing the duties of any job existing

in significant numbers in the national economy.[5]  *Id.*  Consequently, it was determined that Patrick was "disabled" within the meaning of Title II.  *Id.*

In a letter to Taylor dated March 5, 2004, Decker requested copies of all documents in the possession of MetLife concerning Patrick's claim.  Doc. No. 54 at ¶ 207.  Four days later, on March 9, 2004, Decker received a letter from Ericka Gallipeau ("Gallipeau"), an account manager for CORE, stating that all of CORE's records concerning Patrick's claim for STD benefits had been sent to MetLife on April 7, 2003.  Doc. No. 37-23, pg. 8; Appendix Tab E, V-0776.  Gallipeau's letter indicated that a total of 76 boxes had been shipped to MetLife on that date.  *Id.*  On March 10, 2004, Taylor forwarded to Decker the documentation that he had requested in his earlier letter.  Doc. No. 54 at ¶ 209.  She also informed him that Dr. Hopkins had conducted the physician consultant review for Patrick's appeal.  *Id.*

Patrick formally appealed MetLife's decision by means of a letter from Decker to the VCRC dated March 11, 2004.  *Id.* at ¶ 210.  The letter was addressed to Donna Pikora ("Pikora"), who was employed by Hewitt.  *Id.*  Along with his letter, Decker sent Patrick's disability-related medical records to the VCRC.  *Id.*  Included within these records was a copy of the ALJ's decision granting Patrick's application for disability insurance benefits under the Social Security Act.  *Id.* at ¶ 211.  In his letter, Decker opined that MetLife had acted in bad faith by failing to consider the documents which CORE had shipped to MetLife on April 7, 2003.  Doc. No. 37-7, pgs. 2-3; Appendix Tab E, V-0127-V-0128.  He also made reference to CORE documents which had not yet been sent to the VCRC, asking that consideration of Patrick's appeal be delayed pending the VCRC's receipt of those documents.  *Id.*  On March 22, 2004, Donna Aronofsky ("Aronofsky"), a registered nurse employed by CORE, faxed some records

---

[5]The ALJ's determination concerning Patrick's inability to perform the duties of jobs existing in the national economy was dispositive because of 42 U.S.C. § 423(d)(2)(A), which provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."

42 U.S.C. § 423(d)(2)(A).

related to Patrick's claim to Heather Hayden ("Hayden"), a member of the Verizon Claims Review Unit ("VCRU"). Doc. No. 54 at ¶ 218.

Dr. Brian T. Morris ("Dr. Morris"), Verizon's medical director, reviewed the records which had been submitted to the VCRC in connection with Patrick's appeal. *Id.* at ¶ 219. He never examined Patrick himself. *Id.* at ¶ 220. In an unsigned memorandum to the VCRC dated April 30, 2004, Dr. Morris recommended that Patrick's claim for LTD benefits be denied. Doc. No. 37-6, pgs. 17-19; Appendix Tab E, V-0107-V-0109. He concluded his memorandum with the following observations:

> In summary, Ms. Patricia Patrick has a history of chronic low back pain, which has not improved significantly since spinal decompression surgery with L4-5 fusion on 08-31-01. Follow-up x-rays and MRI scans show proper placement of the hardware and no nerve compression. She complains of radicular left symptoms, but her nerve conduction studies have been consistently normal. It appears that she experiences some degree of pain, especially with prolonged activities, such as sitting, standing, and walking. However, her pain does not appear to be of a nature and severity such that it would preclude her from working in *any* occupation or employment for which she was qualified or may become reasonably qualified taking into account her training, education, and experience. Therefore, I do not recommend LTD benefits.

Doc. No. 37-16, pg. 19; Appendix Tab E, V-0109 (emphasis in original). Neither Patrick nor Decker was afforded an opportunity to review Dr. Morris' memorandum to the VCRC. Doc. No. 54 at ¶ 231.

On May 6, 2004, Lynn K. Hagius ("Hagius"), a case manager for MetLife, forwarded to the VCRC copies of the documents from Patrick's CORE file that had previously been missing. Doc. No. 54 at ¶ 232. Hagius stated in a letter attached to the documents that Decker had asked that the VCRC specifically inform him of its receipt of the documents. Doc. No. 37-9, pg. 1; Appendix Tab E, V-0176. Included within the documents forwarded to the VCRC was a copy of Dr. Frame's IME report. Doc. No. 54 at ¶ 232.

On May 27, 2004, Hewitt prepared for the VCRC a document summarizing the matters at issue with respect to Patrick's appeal. *Id.* at ¶ 233. Dr. Morris' memorandum was attached as an exhibit to the document. *Id.* The document concluded with the following "miscellaneous" observations:

> In his letter to the Committee, Mr. Decker indicates that no where [sic] in MetLife's list of reviewed documentation did they indicate they had reviewed Ms. Patrick's STD file. He requested a copy of Ms. Patrick's STD file from CORE. CORE indicated that they sent Ms. Patrick's file to MetLife. MetLife stated that they were unable to locate her STD file. Mr. Decker requested that the Committee review and consider Ms. Patrick's STD file as part of her LTD appeal. The VCRU was only able to obtain a copy of CORE's diary notes.

Doc. No. 37-6, pg. 16; Appendix Tab E, V-0106. The VCRC decided during a meeting conducted on May 27, 2004, to deny Patrick's claim for LTD benefits. Doc. No. 37-6, pg. 11; Appendix Tab E, V-0101. The VCRC informed Decker of its decision to deny Patrick's claim in a letter dated June 7, 2004. Doc. No. 37-6, pgs. 2-8; Appendix Tab E, V-0092-V-0098.

Had Patrick established her entitlement to LTD benefits, she would have started to receive them on or around September 6, 2002. Doc. No. 54 at ¶ 257. She would have received LTD benefits amounting to 50% of her earnings (i.e., $1,966.66 per month) minus the amounts of benefits received from other sources, such as disability insurance benefits under the Social Security Act. *Id.* at ¶ 258. She would have also been entitled to other types of benefits. *Id.* at ¶¶ 260-261, 263. As long as she was still considered to be disabled under the Plan, her LTD benefits would have continued for the duration of her life. *Id.* at ¶ 264.

On June 7, 2007, Patrick commenced this action against Verizon, Verizon Communications, the Plan, the VCRC and MetLife, alleging violations of the Employee Retirement Income Security Act of 1974 (the "ERISA") [29 U.S.C. § 1001 *et seq.*]. Doc. No. 2. MetLife was dismissed as a defendant on October 30, 2008, pursuant to a stipulation filed by the parties. Doc. Nos. 34 & 35. The parties filed cross-motions for summary judgment on November 7, 2008. Doc. Nos. 38 & 41. These motions are the subject of this memorandum opinion.

## **Standard of Review**

Federal Rule of Civil Procedure 56(c) reads, in pertinent part, as follows:

> The [summary] judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

In interpreting Rule 56(c), the United States Supreme Court has stated:

> The plain language . . . mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).

An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must view the facts in a light most favorable to the non-moving party, and the burden of establishing that no genuine issue of material fact exists rests with the movant. *Celotex*, 477 U.S. at 323. The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against the moving party." *Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978) (*quoting Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972)). Final credibility determinations on material issues cannot be made in the context of a motion for summary judgment, nor can the district court weigh the evidence. *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir. 1993); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' -- that is, pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325. If the moving party has carried this burden, the burden shifts to the non-moving party, who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Petruzzi's IGA Supermarkets*, 998 F.2d at 1230. When the non-moving party's evidence in opposition to a properly supported motion for summary judgment is "merely colorable" or "not significantly probative," the court may grant summary judgment.

*Anderson*, 477 U.S. at 249-250.

**Discussion**

Before proceeding to the merits of Patrick's claims, the Court must address some preliminary issues. The Defendants contend that the Plan is the only proper defendant in this case. Doc. No. 39, pg. 29. They also argue that Patrick cannot proceed under § 502(a)(3) [29 U.S.C. § 1132(a)(3)] of the ERISA, since she has an adequate remedy available under § 502(a)(1)(B) [29 U.S.C. § 1132(a)(1)(B)]. *Id.*, pgs. 29-31. Because the question of whether a given entity is a proper defendant in an ERISA action often turns on the particular statutory provision at issue, the Court will address the viability of Patrick's various claims before determining which entities are proper defendants in this action.

**A.**     **The Claims Under 29 U.S.C. §§ 1132(a)(3)(B) and 1132(c)(1)(B)**

The relevant statutory provisions, which are codified at 29 U.S.C. § 1132(a), provide:

> **§ 1132. Civil enforcement**
> **(a) Persons empowered to bring a civil action.** A civil action may be brought–
> > (1) by a participant or beneficiary–
> > > (A) for the relief provided for in subsection (c) of this section, or
> > > (B) to recover for benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
>
> \*\*\*
> > (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan;
>
> \*\*\*

29 U.S.C. § 1132(a)(1)-(3). In her Amended Complaint, Patrick appears to assert claims under both § 1132(a)(1)(B) and § 1132(a)(3)(B). Doc. No. 2, pg. 16, ¶¶ 99-101. The Defendants argue that Patrick cannot proceed under § 1132(a)(3)(B) *because* she can proceed under § 1132(a)(1)(B). Doc. No. 39, pgs. 29-31.

In *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996), the Supreme Court construed § 1132(a)(3) as a "catchall" provision designed to provide a "safety net" for the benefit of those whose statutory injuries could not be redressed under the more specific provisions of § 1132(a).

18

By its very terms, § 1132(a)(3)(B) provides for "*appropriate* equitable relief." 29 U.S.C. § 1132(a)(3)(B)(emphasis added). Speaking through Justice Breyer, the Supreme Court explained in *Varity Corp.* that "where Congress [has] elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'" *Varity Corp.*, 516 U.S. at 515. The United States Court of Appeals for the Third Circuit has relied on *Varity Corp.* for the general proposition that where Congress has specifically provided for appropriate relief under § 1132(a)(1)(B), further equitable relief ought not be provided under § 1132(a)(3)(B). *Ream v. Frey*, 107 F.3d 147, 152 (3d Cir. 1997).

Patrick's employment with Verizon was terminated on September 4, 2002, because she failed to return to work after the expiration of her STD benefits. Doc. No. 37-25, pg. 19; Appendix Tab F, PP000115. She argues in her responsive brief that she was forced to obtain private health insurance coverage for both herself and her husband in the aftermath of her termination, and that this expense would not have been necessary had she been granted LTD benefits under the Plan. Doc. No. 52, pg. 13. The record contains documentary evidence indicating that Patrick was forced to delay a recommended MRI scan in order to obtain insurance coverage for the procedure. Doc. No. 37-25, pg. 11; Appendix Tab F, PP00083. As Patrick points out, an award of LTD benefits under the Plan would not compensate her for this expense. Doc. No. 52, pg. 13. For this reason, she argues that she can proceed under § 1132(a)(3)(B) even though the crux of her case centers on § 1132(a)(1)(B).

A close examination of the filings in this case reveals that Patrick's argument cannot carry the day. In her Amended Complaint, Patrick alleges violations of §§ 1132(a)(1)(B) and 1132(a)(3)(B) in a single count. Doc. No. 2, pg. 16, ¶¶ 99-101. Her averments do not differentiate between the relief sought under § 1132(a)(1)(B) and that sought under § 1132(a)(3)(B). *Id.* The Amended Complaint contains no mention of Patrick's need to incur the expense of obtaining private health insurance for herself and her husband. Doc. No. 2. Patrick never mentioned this expenditure in her filings until she filed her responsive brief. Doc. No. 52, pg. 13. An ERISA plaintiff cannot defeat a properly supported motion for summary judgment by conveniently recharacterizing the claims alleged in his or her complaint. *Erbe v. Billeter*, Civil Action No. 06-113, 2007 WL 2905890, at *12, 2007 U.S. Dist. LEXIS 72835, at *46-47

(W.D.Pa. September 28, 2007).

Even if Patrick had actually asserted a claim under § 1132(a)(3)(B) for the cost of obtaining private health insurance in lieu of that provided under the Plan, such a claim would fail in any event. Section 1132(a)(3)(B) provides only for *equitable* relief. It does not authorize relief that is *legal* in nature. Although Patrick seeks a form of "restitution," the Supreme Court made it clear in *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204, 212-717 (2002), that § 1132(a)(3)(B) provides for an award of restitution only insofar as it is properly available as an equitable remedy. In order for restitution to lie in equity, the plaintiff's action "must seek not to impose personal liability on the defendant, but to restore to the plaintiff *particular* funds or property in the defendant's possession." *Knudson*, 534 U.S. at 714-715 (emphasis added; footnote omitted). An action to recoup expenses incurred by Patrick in obtaining private health insurance cannot reasonably be characterized as an action to restore to her *particular* funds or property in the possession of the Defendants. At no time did any of the Defendants possess or control the money that Patrick paid to obtain private health insurance. While the failure of the Defendants to provide Patrick with LTD benefits under the Plan undoubtedly put her in a situation in which she felt *practically* compelled to incur such expenses, she was *legally* free to remain uninsured. The relief which she seeks (i.e., restitution in the form of reimbursement for the money that she spent to obtain private health insurance in lieu of the insurance that she would have retained had she been granted LTD benefits under the Plan) is properly characterized as a form of consequential damages. *Inacom Corp. v. Sears, Roebuck & Co.*, 254 F.3d 683, 691 (8th Cir. 2001)(defining "consequential damages" as "loss or injury that does not flow directly and immediately from a defendant's wrongful action but still occur[s] as a result or consequence of that action"). This form of relief is essentially legal in nature. *Schmidt v. Ameritank, Inc.*, Civil Action No. 07-90, 2008 WL 268719, at *1, 2008 U.S. Dist. LEXIS 6752, at *4-5 (S.D.Ill. January 30, 2008). As such, it is not available under § 1132(a)(3)(B).[6]

---

[6]In her responsive brief, Patrick correctly notes that the provision of retrospective and prospective LTD benefits under the Plan will not compensate her for the expenses that she incurred in obtaining private health insurance. Doc. No. 52, pg. 13. By making this observation, she implicitly concedes that she cannot seek such compensation under § 1132(a)(1)(B), which only permits her to recover benefits, or to enforce rights, that are due to her *under the terms of the Plan*. Section 1132(a)(1)(B) does not provide for the recovery of "extracontractual damages." *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 144 (1985).

*Knudson*, 534 U.S. at 209-219.  Accordingly, the Defendants are entitled to summary judgment with respect to Patrick's § 1132(a)(3)(B) claims.

In the Amended Complaint, Patrick alleges that the Defendants violated 29 U.S.C. § 1132(c) by failing to provide her with timely access to documents related to her claim for LTD benefits.  Doc. No. 2, pg. 18, ¶ 105.  This claim presumably arises under § 1132(c)(1)(B), which provides a court with *discretionary* authority to hold an administrator personally liable in an amount up to $100.00 for every day (after the passage of 30 days from a document request by a participant or beneficiary) that such administrator fails or refuses to provide an individual with documents to which he or she is entitled under the ERISA.  29 U.S.C. § 1132(c)(1)(B).  The parties have not discussed this claim at all in their briefs.  It is not clear from the record whether Patrick intended to abandon this claim when she stipulated to the dismissal of MetLife as a defendant in this action.  Doc. No. 34.  In any event, her failure to advance her § 1132(c)(1)(B) claim is reason enough to find that she has abandoned it.  *Smith v. Amedisys, Inc.*, 298 F.3d 434, 451 (5th Cir. 2002).  For this reason, summary judgment will be entered in favor of the Defendants with respect to any claims asserted by Patrick under § 1132(c).

**B.** **The Proper Defendants Under 29 U.S.C. § 1132(a)(1)(B)**

The remaining claims arise under § 1132(a)(1)(B).  Relying on *Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482, 1491 (7th Cir. 1996), *Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir. 1993), and *Madden v. ITT Long Term Disability Plan for Salaried Employees*, 914 F.2d 1279, 1287 (9th Cir. 1990), the Defendants argue that the Plan is the only proper defendant in this action.  Doc. No. 39, pg. 29.  Patrick apparently believes that she can proceed against Verizon, Verizon Communications and the VCRC.  Doc. No. 52, pgs. 15-16.

As always, the Court's analysis must begin with the statutory language enacted by Congress.  The statutory language most relevant to this issue is codified at 29 U.S.C. § 1132(d), which provides:

> **(d) Status of employee benefit plan as entity.**  (1) An employee benefit plan may sue or be sued under this title as an entity.  Service of summons, subpena [sic], or other legal process of a court upon a trustee or an administrator of an employee benefit plan in his capacity as such shall constitute service upon the employee benefit plan.  In a case where a plan has not designated in the summary plan description of the plan an individual as agent for the service of legal process,

service upon the Secretary shall constitute such service. The Secretary, not later than 15 days after receipt of service under the preceding sentence, shall notify the administrator or any trustee of the plan of receipt of such service.

(2) Any money judgment under this title against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this title.

29 U.S.C. § 1132(d). Section 1132(d)(1) makes it clear that the Plan, as an entity, is a proper defendant in this action. This is not disputed by the parties. The disagreement between the parties concerns whether Patrick can proceed with her claims against Verizon, Verizon Communications and the VCRC.

The language of § 1132(d) sheds considerable light on this question. First of all, it specifically leaves open the possibility that an individual-capacity claim can be asserted against a "person" other than the employee benefit plan at issue. As the United States Court of Appeals for the First Circuit observed in *Evans v. Akers*, 534 F.3d 65, 73 (1st Cir. 2008), "the concepts of 'benefits' and 'damages' are not mutually exclusive." The fact that compensatory, consequential and punitive damages are generally not available under § 1132(a)(1)(B) does not necessarily mean that a plaintiff such as Patrick cannot obtain monetary relief. *Id.* An award of "benefits due" under § 1132(a)(1)(B) can constitute a "money judgment" within the meaning of § 1132(d)(2) even though such relief is properly characterized as equitable in nature. *Hahnemann University Hospital v. Allshore, Inc.*, 514 F.3d 300, 309 (3d Cir. 2008). Moreover, even when no basis exists for holding an entity or individual other than an employee benefit plan liable, a plaintiff can still assert an official-capacity claim against a plan administrator (which is essentially a claim that is only nominally asserted against the plan administrator and is, for all practical purposes, a claim against the relevant plan itself). *Graden v. Conexant Systems, Inc.*, 496 F.3d 291, 301 (3d Cir. 2007). In either case, a plaintiff can proceed against both the plan itself and any fiduciaries who control its administration. *McRae v. Rogosin Converters, Inc.*, 301 F.Supp.2d 471, 475 (M.D.N.C. 2004).

The ERISA defines the term "fiduciary" broadly enough to include any "person" who exercises "discretionary authority or discretionary control" over a plan or its assets, as well as any

"person" who has "discretionary authority or discretionary responsibility" with respect to "the administration of such plan." 29 U.S.C. § 1002(21)(A)(i), (iii). When MetLife was dismissed as a defendant in this action, the remaining "Verizon Defendants" stipulated that they had "retained final authority and responsibility" for the operation of the Plan. Doc. No. 34, pg. 2, ¶ 5. Hence, it is undisputed that Verizon, Verizon Communications and the VCRC are "fiduciaries" within the meaning of the ERISA. Under these circumstances, there is no basis for dismissing these entities as defendants. *Evans v. Employee Benefit Plan*, 311 Fed.Appx. 556, 558 (3d Cir. 2009)(observing that the exercise of control over the administration of benefits is the "defining feature" of a proper defendant under § 1132(a)(1)(B)).

In *Hahnemann University Hospital v. Allshore, Inc.*, 514 F.3d 300, 309 (3d Cir. 2008), the United States Court of Appeals for the Third Circuit held that when a denial of "benefits due" under a plan arises from a plan administrator's breach of its fiduciary obligations, a plaintiff can proceed against the administrator under § 1132(a)(1)(B). In *Hahnemann University Hospital*, the Court of Appeals addressed a situation in which a plaintiff was not seeking benefits from a plan's assets, but was instead seeking to hold both the plan and its administrator jointly and severally liable for a denial of benefits. *Hahnemann University Hospital*, 514 F.3d at 309. The Court understands Patrick to be seeking benefits solely from the assets of the Plan itself. Doc. No. 2, pgs. 17-19. Consequently, she cannot hold Verizon, Verizon Communications or the VCRC directly liable in this action. Nevertheless, she can seek an order requiring these entities to pay her LTD benefits from the Plan's assets. *Id.* at 308. With the understanding that Patrick proceeds against Verizon, Verizon Communications and the VCRC only in their official capacities as plan administrators and fiduciaries, the Court will deny the Defendants' request that these parties be dismissed as defendants.

**C.      The Merits of Patrick's Claims Under 29 U.S.C. § 1132(a)(1)(B)**

The remaining issue for the Court's consideration is whether Patrick has established her entitlement to LTD benefits under the Plan. As noted earlier, she brings this action under § 1132(a)(1)(B) "to recover benefits" due to her under the terms of the Plan, "to enforce" her rights under the terms of the Plan, and "to clarify" her rights to "future benefits" under the terms of the Plan. 29 U.S.C. § 1132(a)(1)(B). The statutory language is silent as to what standard of review

should govern a court's consideration of such claims under the ERISA. Nevertheless, in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989), the Supreme Court explained that principles of trust law determine the appropriate standard of review in claims brought under § 1132(a)(1)(B). In accordance with such principles, "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire*, 489 U.S. at 115. Where an administrator or fiduciary exercises discretionary authority, principles of trust law call for a deferential standard of review. *Id.* at 111. In any event, however, the Supreme Court made it clear in *Firestone Tire* that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest," that conflict must be weighed as a factor in determining whether a given denial of benefits constituted an abuse of discretion. *Id.* at 115.

In *Metropolitan Life Insurance Co. v. Glenn*, 128 S.Ct. 2343, 2348 (2008), the Supreme Court held that an administrator operates under a "conflict of interest" when it both evaluates claimants' eligibility for benefits under a plan and pays benefits to those deemed to meet the applicable eligibility criteria. While such a conflict of interest has no impact on the applicable standard of review, a court must weigh it as a factor in determining whether a plaintiff can establish his or her entitlement to benefits under that standard of review. *Glenn*, 128 S.Ct. at 2350-2352. Because "benefits determinations arise in many different contexts and circumstances," the relevant factors for consideration in ERISA cases tend to be "varied and case-specific." *Estate of Schwing v. Lilly Health Plan*, 562 F.3d 522, 526 (3d Cir. 2009).

Before determining whether Patrick is entitled to LTD benefits, the Court must determine the applicable standard of review. Section 11.1 of the Plan provides:

**11.1 Benefit Claim and Appeal Procedures**
The Claims Administrator, the Appeals Administrator and (if applicable) the Final Appeals Administrator for the Plan are Named Fiduciaries of the Plan; provided, however, that the Chairperson of the Verizon Claims Review Committee shall have the authority and power to assume the role of Named Fiduciary with respect to claims and appeals to be decided under the Plan, and shall have the discretion to treat the Claims Administrator and/or the Appeals Administrator as the agent of the Verizon Claims Review Committee for purposes of deciding such claims and appeals. In any event, the Claims Administrators, the Appeals Administrators and

24

the Final Appeals Administrators have the right, and the full discretion and authority, to:

•      Interpret the Plan based on the Plan's provisions and applicable law, and make factual determinations about claims arising under the Plan;

•      Determine whether a claimant is eligible for benefits;

•      Decide the amount, form, and timing of benefits; and

•      Resolve any other matter under the Plan that is raised by a Participant or a beneficiary, or that is identified by either the Claims Administrator, Appeals Administrator, or the Final Appeals Administrator.

The Claims Administrator has sole authority to exercise discretion in the resolution of claims under the Plan. The Appeals Administrator has sole authority to exercise discretion in the review and resolution of any initial appeal of a denied claim. In the case where the Final Appeals Administrator has been designated, the Final Appeals Administrator has the sole authority to exercise discretion in the review and resolution of a final appeal of a claim denied on initial appeal under the Plan. In the case of an appeal under the Plan for which a Final Appeals Administrator has been designated, the Final Appeals Administrator has sole authority to exercise discretion in the review and resolution of a final appeal of a claim denied upon initial appeal under the Plan. In the case of an appeal under the Plan for which no Final Appeals Administrator has been designated, or (where applicable) in the case of a final appeal, the decision of the Appeals Administrator (or, where applicable, the Final Appeals Administrator) is final and binding on all parties to the full extent permitted under applicable law, unless the participant or a beneficiary later proves that the Appeals Administrator's decision (or, where applicable, the Final Appeals Administrator's decision) was an abuse of discretion. A misstatement or other mistake of fact shall be corrected when it becomes known, and the applicable Administrator shall make such adjustment on account thereof as it considers equitable and practicable.

Doc. No. 37-3, pg. 23; Appendix Tab B, V-0022. This language makes it abundantly clear that the administrators were exercising discretionary authority when they denied Patrick's claim for LTD benefits. Therefore, the applicable principles of trust law call for the application of a deferential standard of review. *Firestone Tire*, 489 U.S. at 111. In accordance with the language of the Plan, the Court cannot review the Defendants' decision *de novo*, and can set aside that decision only upon a showing of "an abuse of discretion." Doc. No. 37-3, pg. 23; Appendix Tab

B, V-0022.

Having thoroughly reviewed the documentary record in this case, the Court is convinced that the Defendants abused their discretion in denying Patrick's claim for LTD benefits. Several different factors have led to this conclusion. First of all, it is undisputed that the Defendants were operating under a financial conflict of interest when Patrick's claim was denied. Although the parties dispute the *significance* or *severity* of that conflict, the *existence* of it was clear. *Glenn*, 128 S.Ct. at 2350. The Defendants argue that the conflict was minimal because MetLife handled the first two stages of review, and because the members of the VCRC were salaried employees whose compensation was not impacted by whether Patrick's LTD claim was honored or denied. Doc. No. 39, pgs. 18-20. Patrick argues that the conflict was significant because Verizon funded the Plan through its general assets rather than through a segregated fund. Doc. No. 42, pg. 6. A financial conflict of interest is significantly mitigated when claims administrators are walled off from those responsible for an employer's finances. *Glenn*, 128 S.Ct. at 2351. On the other hand, such a conflict is magnified when an employer pays claims out of its general operating budget rather than out of a segregated fund set aside exclusively for that purpose. *Post v. Hartford Insurance Co.*, 501 F.3d 154, 163 (3d Cir. 2007). In this case, there is no need for an exhaustive discussion concerning the precise nature of the financial conflict of interest, since it does not serve as a "tiebreaker" between "closely balanced" factors. *Glenn*, 128 S.Ct. at 2351. It suffices to say that the mere *existence* of a conflict of interest weighs in favor of Patrick.

In *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003), the Supreme Court held that the ERISA did not require a plan administrator to "accord special deference to the opinions of treating physicians." Nevertheless, the Supreme Court also made clear that a plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Nord*, 538 U.S. at 834. During the relevant period of time, several of Patrick's treating physicians expressed the view that she was incapable of working. Doc. No. 37-17, pgs. 14-25, Appendix Tab E, V-0631-V-0648. In *Nord*, the Supreme Court declared that a plan administrator has no "discrete burden of explanation" when it chooses to "credit *reliable evidence* that conflicts with a treating physician's evaluation." *Nord*, 538 U.S. at

26

834 (emphasis added). After all, a decision to credit one form of reliable evidence over another cannot be properly characterized as *arbitrary*. *Stratton v. E.I. DuPont de Nemours & Co.*, 363 F.3d 250, 258 (3d Cir. 2004). In this case, however, the opinions of Patrick's treating physicians were not contradicted by *reliable evidence*. Instead, they were contradicted only by the conclusory reports of non-examining physicians who based their opinions on a patent mischaracterization of Dr. Donaldson's findings.

In their consultative reports, both Dr. Hopkins and Dr. Morris stated that Dr. Donaldson had concluded, on August 29, 2002, that Patrick could start working for up to four hours per day. Doc. No. 37-6, pg. 18; Appendix Tab E, V-0108; Doc. No. 37-17, pg. 6; Appendix Tab E, V-0622. A close examination of Dr. Donaldson's statement, however, reveals that Patrick was *not* cleared to return to work as of that date. It is true that Dr. Donaldson indicated, by means of a written notation, that Patrick would be able to work for up to four hours per day upon her initial return to work. Doc. No. 37-13, pg. 9; Appendix Tab E, V-0294. Nonetheless, on the section of the statement inquiring as to whether Patrick had been advised to return to work, Dr. Donaldson placed a slash mark through the box next to the word "No." *Id.* Next to the box, Dr. Donaldson wrote the words "patient to be re-evaluated next visit." *Id.* When read within the context of the entire statement, Dr. Donaldson's indication that Patrick could work four hours per day referred to an undetermined time in the future rather than to the date of the statement itself. Thus, Dr. Donaldson's statement of August 29, 2002, provided no support for Dr. Hopkins' and Dr. Morris' opinions that Patrick was capable of working for up to four hours per day as of September 6, 2002. Doc. No. 37-6, pgs. 17-19; Appendix Tab E, V-0107-V-0109; Doc. No. 37-17, pgs. 6-8; Appendix Tab E, V-0622-V-0624.

On April 16, 2002, Dr. Frame completed an IME report in which he expressed the view that Patrick's return-to-work date was "undetermined." Doc. No. 37-9, pgs. 7-8; Appendix Tab E, V-0182-V-0183. Admittedly, this IME was conducted approximately four and a half months prior to the period of time at issue. Nevertheless, no physician examined Patrick on behalf of the Defendants subsequent to Dr. Frame's IME. Doc. No. 54 at ¶ 46. Nothing in Dr. Frame's IME report supports the VCRC's ultimate conclusion that Patrick was not disabled as of September 6, 2002. The fact that MetLife and the VCRC apparently ignored the findings of a neutral,

consultative examiner weighs heavily against the Defendants in this case. *Wible v. Aetna Life Insurance Co.*, 375 F.Supp.2d 956, 971 (C.D.Cal. 2005).

In *Glenn*, the Supreme Court acknowledged that a plan administrator can be found to have engaged in "procedural unreasonableness" where it has ignored an award of benefits under the Social Security Act after having affirmatively encouraged the claimant to apply for such benefits. *Glenn*, 128 S.Ct. at 2352. Patrick was informed by MetLife that she should apply for Social Security disability benefits. Doc. No. 37-13, pg. 4; Appendix Tab E, V-0289. Because of the demanding standard for establishing disability under the Social Security Act, courts have recognized that a plan administrator's failure to consider an award of Social Security disability benefits in support of a claim for benefits under a plan can constitute arbitrary and capricious conduct. *Porter v. Broadspire*, 492 F.Supp.2d 480, 487 (W.D.Pa. 2007). Patrick was awarded disability insurance benefits under Title II of the Social Security Act on February 26, 2004. Doc. No. 37-7, pgs. 4-12; Appendix Tab E, V-0129-V-0137. Although the ALJ's decision granting Patrick's application for disability insurance benefits was reviewed by Dr. Morris, it was not discussed in his memorandum to the VCRC. Doc. No. 37-6, pgs. 17-19; Appendix Tab E, V-0107-V-0109. As far as the Court can tell, the VCRC essentially accepted Dr. Morris' recommendation that Patrick's claim for LTD benefits be denied without giving independent consideration to the ALJ's opinion. Doc. No. 37-6, pgs. 9-16; Appendix Tab E, V-0099-V-0106. The fact that Patrick was deemed to be disabled by the ALJ was apparently ignored altogether by the VCRC. This is another factor which weighs in favor of Patrick and against the Defendants. *Goletz v. Prudential Insurance Co. of America*, 425 F.Supp.2d 540, 552 (D.Del. 2006)("While the Social Security Administration's decision is not dispositive, it may be a factor considered by the court in reviewing the administrator's decision.").

Dr. Liss examined Patrick on July 18, 2003. Doc. No. 37-18, pgs. 7-8; Appendix Tab E, V-0649-V-0650. He reported that Patrick's back would begin to hurt if she were to sit for more than five minutes. *Id.* He also indicated that Patrick's back pain may have been caused by something other than the specific back impairment for which she had undergone surgery. *Id.* Dr. Liss recommended that Patrick have no further surgeries until the cause of her pain could be identified with precision. *Id.*

Both Dr. Hopkins and Dr. Morris mentioned Dr. Liss' findings in their written statements concerning Patrick's claim for LTD benefits. Doc. No. 37-6, pg. 18; Appendix Tab E, V-0108; Doc. No. 37-17, pg. 7; Appendix Tab E, V-0623. It is difficult to fathom how Dr. Liss' examination report could be read to support a finding that Patrick's disability had ceased as of September 6, 2002. If Patrick's back pain was caused by something other than the impairment remedied by Dr. Donaldson's surgical intervention, there is no reason to believe that the surgery improved her condition. The Defendants do not dispute that Patrick was disabled during the year following her surgery. That is why she received STD benefits. The reports of Dr. Hopkins and Dr. Morris simply fail to rationally explain how Patrick's condition suddenly improved enough for her to return to work after the expiration of her 52-week period of eligibility for STD benefits.

Because the evidence of record overwhelmingly supported a finding that Patrick was still disabled as of September 6, 2002, and in light of the fact that the written statements provided by Dr. Hopkins and Dr. Morris were based largely on a mischaracterization of Dr. Donaldson's statement of August 29, 2002, the VCRC's final denial of Patrick's claim for LTD benefits was an abuse of discretion. Under certain circumstances, a court can remand an ERISA case to a plan administrator in order to facilitate the consideration of additional evidence. *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 436 (3d Cir. 1997). In this case, however, such a remand would be futile. The medical evidence is quite significantly in Patrick's favor. An IME conducted at this time would not be probative as to whether Patrick was capable of working during the fall of 2002. Summary judgment will be entered in favor of Patrick with respect to her claims under § 1132(a)(1)(B), and she will be entitled to an award of LTD benefits retroactive to September 6, 2002. Under the terms of the Plan, Patrick can be made to undergo medical examinations for the purpose of assessing her continued eligibility for LTD benefits. Doc. No. 37-3, pg. 16; Appendix Tab E, V-0015. There is no reason for the Court to further delay her receipt of LTD benefits for the period of time in which she was unquestionably disabled.

## Conclusion

The Defendants are entitled to summary judgment with respect to the claims arising under §§ 1132(a)(3)(B) and 1132(c)(1)(B), and Patrick is entitled to summary judgment with respect to the claims arising under § 1132(a)(1)(B). In her Amended Complaint, Patrick seeks not only an

order awarding her LTD benefits under the Plan, but also awards of prejudgment interest, costs and attorney's fees. Doc. No. 2, pg. 18. The plain language of 29 U.S.C. § 1132(g)(1) indicates that an award of costs and attorney's fees is committed to the discretion of the Court. 29 U.S.C. § 1132(g)(1). The same is true of prejudgment interest on a judgment procured pursuant to § 1132(a)(1)(B). *Skretvedt v. E.I. DuPont de Nemours*, 372 F.3d 193, 205-208 (3d Cir. 2004). Having reviewed the record in detail, the Court is convinced that an award of costs and attorney's fees is warranted, and that Patrick is entitled to prejudgment interest at the applicable legal rate. An appropriate order follows.

McVerry, J.

cc:    All counsel of record

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PATRICIA PATRICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-766 |
| | ) | |
| VERIZON SERVICES | ) | |
| CORPORATION, a wholly owned | ) | |
| subsidiary of VERIZON | ) | |
| COMMUNICATIONS, INC., | ) | |
| VERIZON COMMUNICATIONS, INC., | ) | |
| LONG-TERM DISABILITY PLAN FOR | ) | |
| MID-ATLANTIC ASSOCIATES, PN | ) | |
| 516 and its ADMINISTRATOR, | ) | |
| VERIZON CLAIMS REVIEW | ) | |
| COMMITTEE, | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER OF COURT

AND NOW, this 8th day of July, 2009, in accordance with the foregoing memorandum opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that Defendants' Motion for Summary Judgment (*Document No. 38*) is **GRANTED** with respect to the claims arising under 29 U.S.C. §§ 1132(a)(3)(B) and 1132(c)(1)(B) and **DENIED** with respect to the claims arising under 29 U.S.C. § 1132(a)(1)(B). Plaintiff's Motion for Summary Judgment (*Document No. 41*) is **GRANTED** with respect to the claims arising under 29 U.S.C. § 1132(a)(1)(B) and **DENIED** with respect to the claims arising under 29 U.S.C. §§ 1132(a)(3)(B) and 1132(c)(1)(B). The Defendants are hereby **ORDERED** to pay long-term disability benefits to the Plaintiff both prospectively and retroactive to September 6, 2002, pursuant to, and subject to the terms and conditions of, the Plan with prejudgment interest at the applicable legal rate. The Plaintiff shall file an appropriate Petition for Counsel Fees, Costs and Expenses on or before July 28, 2009, and the Defendants may respond thereto on or before August 17, 2009.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc:     All counsel of record